**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
HARRISONBURG DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **Plaintiff,** | ) | **Civil Action No. 5:11cv088** |
| | ) | |
| **v.** | ) | |
| | ) | **By:  Michael F. Urbanski** |
| **$119,030.00 in U.S. Currency** | ) | **United States District Judge** |
| | ) | |
| **Defendant.** | ) | |

## <u>MEMORANDUM OPINION</u>

This case concerns disputed claims to the ownership of $119,030.00 in United States currency seized by the government during a search following a traffic stop on Interstate 81 in western Virginia.  Although the driver of the vehicle, Jonte D. Hamilton ("Hamilton"), denied any knowledge or ownership of the large volume of cash hidden in the rental car at the time of the traffic stop, he now claims it was family money intended to pass to him on his thirtieth birthday.  Hamilton's mother, LaVonia A. Cogdell ("Cogdell"), disclaiming any ownership of the money herself, purports to corroborate her son's story.  Having reviewed the affidavits filed in this case, the deposition testimony of both Hamilton and Cogdell and the briefs and motions filed by the parties, the court concludes that neither Hamilton nor Cogdell has a possessory or ownership interest in the subject currency.  As such, they lack standing to assert a claim to the money.  Further, as the government has established by a preponderance of the evidence that there is a substantial connection between the seized property and illegal drug activity, it is forfeited to the United States.  Therefore, the government's motion for summary judgment, Dkt. # 13, is **GRANTED**, and Cogdell's motion for summary judgment, Dkt. # 24, is **DENIED**.

## I.

This is a civil action in rem brought by the United States to forfeit and condemn $119,030.00 in U.S. currency to the use and benefit of the United States pursuant to 21 U.S.C. § 881(a)(6). The United States claims the currency is subject to forfeiture because it was used, or was intended to be used, to facilitate a drug trafficking offense in violation of 21 U.S.C. § 801 et seq., and/or represents proceeds from a violation thereof. Cogdell and her son, Hamilton, filed a claim for the currency, alleging that Cogdell is the legal owner of the currency and Hamilton is the equitable owner of the currency. After deposing Cogdell and Hamilton, the United States filed its Motion to Strike and Motion for Summary Judgment. Dkt. # 13. Hamilton subsequently filed a Motion to Suppress, Dkt. # 23, and Cogdell has filed a Motion for Summary Judgment. Dkt. # 24. The events giving rise to this case are as follows.

## A.

On the evening of January 13, 2011, Virginia State Trooper Joseph Miller ("Trooper Miller") stopped, upon suspicion of speeding, a rented 2004 Ford Explorer with Maryland license plates. At the time, the vehicle was traveling southbound on Interstate 81 at mile marker 276 in Edinburg, Virginia. Hamilton was driving the vehicle, his friend Moeconi Crutchfield was in the front passenger seat, and David Wright was in the back seat. Trooper Miller noted that the Explorer's rental contract was in Wright's name, and that Hamilton was not listed as an authorized driver. Trooper Miller asked about their travel plans, and Hamilton responded they were traveling from Maryland to Houston, Texas to perform in a rap concert and film a music video. Trooper Miller became suspicious because the rental agreement stated that the car was rented on January 13, 2011, and was due back the night of January 15, 2011, leaving a very short window of time for the claimed music activities in Houston.

According to the affidavit filed by DEA Special Agent Anthony L. Conte, Conte Aff., Dkt. # 1-1, Trooper Miller gave Hamilton a verbal warning for speeding, returned his driver's license to him and told him he was free to leave. Trooper Miller then asked Wright if there was anything illegal in the vehicle or any weapons, drugs, or large amounts of currency. Wright said no. Trooper Miller asked if he could search the vehicle, which request Wright declined. Special Agent Conte's affidavit recites that Trooper Miller had already summoned the assistance of a narcotics canine due to the criminal indicators during the traffic stop. According to Special Agent Conte, Wright did not object to an exterior scan of the vehicle by a drug-sniffing dog. When the drug-sniffing dog positively alerted to the rear passenger side of the vehicle, Trooper Miller began to search the Explorer. Trooper Miller found four cellular telephones in the center console of the Explorer and two briefcases in the back seat. Upon opening one briefcase, Trooper Miller smelled a strong odor of marijuana, but found no illegal drugs in the vehicle. Trooper Miller noticed that several screws holding the tailgate door appeared to have been tooled and that the door panel itself was loose. Behind the door panel, Trooper Miller found $119,030.00 in U.S. currency bundled with rubber bands and wrapped in three separate grocery bags. See Currency Photo, Dkt. # 13-3.

Special Agent Conte's affidavit recounts that Trooper Miller gave the occupants of the Explorer warnings pursuant to Miranda v. Arizona, 384 U.S. 436 (1966), and separately questioned them about the currency. None of the three occupants claimed knowledge or ownership of the money. Each of them, including Hamilton, signed an asset disclaimer form, waiving any interest in the cash. When Special Agent Conte arrived on the scene, he further questioned Hamilton. Hamilton reiterated that they were traveling to Houston to film a rap video with a producer he met on Facebook. Hamilton repeated his denial of knowledge or ownership

of the currency to Special Agent Conte. Hamilton told Special Agent Conte that he had a prior conviction for marijuana distribution. Special Agent Conte determined there was probable cause to subject the currency to forfeiture, and the currency was seized and placed in the custody of the United States Marshals Service in the Seized Asset Deposit Fund Account.

In his deposition testimony, Hamilton disputes certain of the events described in the Conte affidavit. First, as he was not ticketed with a traffic violation, Hamilton disputes that he was speeding. Hamilton Dep., Dkt. # 13-2, at 42, 58. Hamilton denies that there was any odor of marijuana in the vehicle or that any of the three occupants had smoked marijuana in the Explorer. As such, Hamilton considers the pretext for the traffic stop and search to be fabricated. Id. at 54, 58. Hamilton described Trooper Miller's demeanor as "very aggressive, first off, because after he pulled us over and he said that we was speeding and he smelled marijuana, he asked could he search the car while all our paperwork was getting done, and we specifically said 'no' and he did it anyway." Id. at 53-54. Hamilton stated that he was not given a Miranda warning and was scared because he knew the money was in the car. Id. at 55-56. Hamilton agreed that he told Trooper Miller that he knew nothing of the money and denied ownership of it during the traffic stop. Hamilton said he was nervous, intimidated and scared and signed the form disclaiming any interest in the money because "I just didn't know what else to do. I didn't want to go to jail. I didn't want to . . . I just was confused in all honesty." Id. at 53. Hamilton testified that he was scared during the search "[b]ecause I knew the money was in there." Id. at 56. Hamilton said he was scared both because "I didn't know what my family was going to say," id. at 55, and because of "the officer." Id. at 56-57. During his deposition, Hamilton provided more details of his music plans in Houston than the officers indicated he provided. Id. at 24-31. At the same time, however, Hamilton struggled to come up with a credible explanation for the

presence of the large quantity of bundled cash hidden in the Explorer's back door panel.  Id. at 37-38.

## B.

On March 30, 2011, two and one-half months after the seizure of the currency, Hamilton wrote a letter in response to a forfeiture notice from the DEA.  Hamilton's letter requested return of the monies, stating that "[t]hese funds had been in the family for many years and had been kept in a safe location in Virginia."  Hamilton Claim Letter, Dkt. # 30.  Cogdell testified that she actually wrote Hamilton's March 30, 2011 letter, but did not submit her own claim letter at the time because "[i]t was his funds . . . and he was the one that had it at the time."  Cogdell Dep., Dkt. # 13-5, at 43.

On September 1, 2011, the United States filed a forfeiture complaint.  On October 8, 2011, Cogdell and Hamilton jointly filed a written claim to the money.  The claim states that "LaVonia A. Cogdell is the legal owner of all of the aforesaid currency.  Jonte D. Hamilton is the equitable owner of all of the aforesaid currency as he is to receive it upon reaching thirty years of age on 05/06/2012."  Dkt. # 3.  After filing their claim, Cogdell and Hamilton were deposed regarding their claim to the subject currency.

In her deposition testimony, Cogdell claims the seized currency was a gift from Alphonzo Brooks ("Brooks"), intended for Cogdell's first-born son, Hamilton.  Cogdell described Brooks, a long time companion to Cogdell's grandmother,[1] as an entrepreneur who "always had money," Cogdell Dep., Dkt. # 13-5, at 15-16, garnered from rental property in the District of Columbia and horse breeding in Virginia.  Cogdell explained Brooks' motivation for the gift as follows:

---

[1] Cogdell was raised by her grandmother, and, in deposition, said she considered Brooks to be her grandfather, although he bore no relation to her by blood or marriage.  Cogdell Dep., Dkt. # 13-5, at 11-12.

> And, I remember him telling me . . . because I had two daughters
> first, that when I had my son, that because he didn't have a son, he
> himself had a daughter, he would leave him a gift.

Id. at 11. When Brooks made this passing reference to Cogdell in the late 1970's, Cogdell "actually thought it was a joke" because she did not have a son at the time. Id. at 14. No amount of money was specified, nor was anything written down to memorialize Brooks' statement. Id. at 14, 18, 33. Several years later, in 1982, Hamilton was born. Cogdell's deposition testimony is less than clear as to whether Brooks mentioned leaving money to her son after his birth in 1982, stating: "He may have . . . after the birth of my son, you know, again brought it up, and again, he never specified how much . . . ." Id. at 18. After Brooks died in 1983, his daughter Patricia inherited all of his property. Id. Cogdell inherited nothing from Brooks or her grandmother. Id. at 64.

Cogdell testified that over the next two decades, her grandmother "periodically . . . told me that . . . she had the money that was to be given my son when he turned 30." Id. at 20. Sometime in 2004, Cogdell's grandmother said she needed to talk to her. At that time, Cogdell lived in Maryland, and her grandmother lived in the District of Columbia. Cogdell traveled to the District to see her grandmother, at which time her grandmother handed her a black duffel bag containing $150,000 in cash. Cogdell testified that her grandmother told her "[t]hat this was for Jonte when he turned 30, that I was to give it to him at any time before . . . before then, and she told me to count it." Id. at 22. After receiving the duffel bag from her grandmother, Cogdell took it to her home in Maryland where she asked a friend, Eyvette Watson, to put it in her attic. Id. at 25-29. Cogdell did not see the money again. Id. at 30-31.

Six more years passed. In late 2010, about a month before the traffic stop at issue, Cogdell told Hamilton, then twenty-eight years old, about the money and its location. Id. at 32.

In his deposition testimony, Hamilton claims to know little about the origin of the money other than it had been passed down in his family from his great-grandfather. Hamilton Dep., Dkt. # 13-2, at 68. Hamilton confirmed his mother's testimony that she told him about the money in the attic around Christmas 2010 and that he would get it when he turned thirty. Id. at 66. Hamilton did not wait until he was thirty to take the money. Rather, on the day of the traffic stop, and without anyone knowing, he took the money from the attic and stashed it in the rear door panel in the Explorer. Id. at 79-81, 120-22. Cogdell claims she did not know the money had been taken from the attic until Hamilton told her it had been seized by the police. It is noteworthy that Cogdell does not claim that the money is hers. Rather, in deposition, she testified that "it was always his money." Cogdell Dep., Dkt. # 13-5, at 39.

On January 2, 2013, a month after the hearing in this case, Cogdell filed an affidavit to "clarify the answers in her deposition." Cogdell Aff., Dkt. # 22. Cogdell's affidavit differs from her deposition testimony in one material respect. In her deposition, Cogdell testified that she "didn't consider [the funds as] being held in trust" for Hamilton. Cogdell Dep., Dkt. # 13-5, at 43. In her subsequent affidavit, Cogdell states that it was her "duty and trust" to hold the money until Hamilton turned thirty years old. Cogdell Aff., Dkt. # 22, ¶¶ 6, 7. Cogdell avers that she made a mistake in telling her son about the money before he turned thirty and that he "wrongfully took the currency in the matter from my rightful possession and, without any authority whatsoever from me, hid that currency in a van and then, without any authority, purported to disclaim those funds when found by the police. I was not aware that the money had been taken from my possession until after the currency had been seized." Id. at ¶ 9. Cogdell's affidavit is consistent with her deposition in one important respect. There Cogdell reaffirmed that "it was his money, not mine." Id. at ¶ 10.

On February 6, 2013, Cogdell filed another affidavit, this one executed by Eyvette C. Watson. Watson Aff., Dkt. # 27. In her affidavit, Watson swears that she placed a black gym-type bag containing currency in Cogdell's attic at her request in 2004. While Watson averred that she saw currency in the black bag, she did not know how much money was there. [2]

## II.

Forfeiture actions in rem arising from a federal statute are governed by the Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions ("Supp. R. ____"), a subset of the Federal Rules of Civil Procedure. See 21 U.S.C. § 881(b); 18 U.S.C. § 981(b)(2)(A); Supp. R. G. In the civil forfeiture context, the government's motion to strike "may be presented as a motion for judgment on the pleadings or as a motion to determine after a hearing or by summary judgment whether the claimant can carry the burden of establishing standing by a preponderance of the evidence." Supp. R. G(8)(c)(ii)(B). The 2006 Advisory Committee Notes to Supplemental Rule G(8)(c)(ii)(B) provide further guidance:

> If a claim fails on its face to show facts that would support claim standing, the claim can be dismissed by judgment on the pleadings. If the claim shows facts that would support claim standing, those facts can be tested by a motion for summary judgment. If material facts are disputed, precluding a grant of summary judgment, the court may hold an evidentiary hearing. The evidentiary hearing is held by the court without a jury. The claimant has the burden to establish claim standing at a hearing; procedure on a government summary judgment motion reflects this allocation of the burden.

The government filed its motion accompanied by the affidavit of Special Agent Conte, transcripts of the deposition testimony of Hamilton and Cogdell, a photograph of the seized currency, and a copy of the asset disclaimer form Hamilton signed the night of the traffic stop.

---

[2] The difference between the $150,000 figure and the amount of cash seized, $119,030, remains a mystery. Cogdell testified that she counted $150,000 in the bag given her by her grandmother before having it hidden in the attic, Cogdell Dep., Dkt. # 13-5, at 24, and Hamilton testified that he put $150,000 in the rear door panel of the Explorer on January 13, 2011. Hamilton Dep., Dkt. # 13-2, at 43.

Because the government has asked the court to consider materials outside of the pleadings, the court will address the standing challenge under the familiar summary judgment standard.

Under Federal Rule of Civil Procedure 56, the court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Nguyen v. CNA Corp., 44 F.3d 234, 236-37 (4th Cir. 1995). When making this determination, the court should consider "the pleadings, depositions, answers to interrogatories, and admissions on file, together with . . . [any] affidavits" filed by the parties. Celotex, 477 U.S. at 322. Whether a fact is material depends on the relevant substantive law, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. Celotex, 477 U.S. at 323; Nguyen, 44 F.3d at 237. If that burden has been met, the non-moving party must then come forward and establish the specific material facts in dispute to survive summary judgment. Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986). "All reasonable inferences drawn from the evidence must be viewed in the light most favorable to the party opposing the motion," but "[a] mere scintilla of evidence supporting a case is insufficient." Nguyen, 44 F.3d at 237.

## A.

To seek return of seized property, a claimant must prove an interest in it sufficient to establish standing. A claimant in a federal civil forfeiture proceeding bears the burden to

establish standing by preponderance of the evidence.[3]  United States v. $7,000.00 in U.S. Currency, 583 F. Supp. 2d 725, 729-30 (M.D.N.C. 2008); Supp. R. 6(8)(c)(2)(B).  If a claimant cannot establish standing, there is no "case or controversy."  583 F. Supp. 2d at 729 (internal quotations omitted).  To establish Article III standing, the claimant must have a "legally cognizable interest in the property that will be injured if the property is forfeited to the government."  Id.  At the summary judgment stage, a claimant must present some evidence of ownership interest in the subject property beyond the mere assertion of an ownership interest. United States v. $133,420.00 in U.S. Currency, 672 F.3d 629, 638-39 (9th Cir. 2012). "Ownership may be established by proof of actual possession, control, title, and financial stake." United States v. One (1) 1983 Homemade Vessel Named Barracuda, 625 F. Supp. 893, 897 (S.D. Fla. 1986).  "It is well settled that a bare assertion of ownership in the property, without more, is not enough to prove an ownership interest sufficient to establish standing."  Arevalo v. United States, No. 05-110, 2011 WL 442054, at *3 (E.D. Pa. Feb. 8, 2011).  Instead, "a claimant must show that he has a colorable ownership or possessory interest in the funds."  Id.  "Article III's standing requirement is thereby satisfied because an owner or possessor of property that has been seized necessarily suffers an injury that can be redressed at least in part by the return of the seized property."  United States v. $515,060.42 in U.S. Currency, 152 F.3d 491, 497 (6th Cir. 1998).

---

[3] Hamilton has filed a motion to suppress any evidence resulting from the traffic stop, asserting that it was unconstitutional.  Dkt. # 23.  Before the court can address any claim contesting the legality of the search and seizure in this case, it must first address the claimants' standing.  See United States v. $1,185,135.00, 320 F. App'x 893, 894-95 (11th Cir. 2008) (per curiam) (unpublished); United States v. $321,470, U.S. Currency, 874 F.2d 298 (5th Cir. 1989) (affirming district court ruling that claimant's motion to suppress was moot because claimant lacked standing); see also Supp. R. G(8)(b)(i) ("A claimant who establishes standing to contest forfeiture may move to dismiss the action under Rule 12(b).").  Regardless of the order in which the issues are addressed, it is clear that Hamilton, an unauthorized driver of a rental vehicle, cannot assert a Fourth Amendment challenge to the search of the Explorer rented to David Wright.  See United States v. Mincey, 321 F. App'x 233, 239-41 (4th Cir. 2008) (unpublished) ("Put simply, Mincey, as an unauthorized driver under the Armada rental contract, had no legitimate expectation of privacy in the rental vehicle and cannot contest the warrantless search of the vehicle on Fourth Amendment grounds."); United States v. Thomas, 128 F. App'x 986, 990 (4th Cir. 2005) (unpublished); United States v. Wellons, 32 F.3d 117, 119 n.2 (4th Cir. 1994).  As such, Hamilton's motion to suppress is denied.

The elements of standing "must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, i.e., with the manner and degree of evidence required at the successive stages of the litigation." Lujan v. Defenders of Wildlife, 504 U.S. 555, 561 (1992). This rule applies equally in civil forfeiture proceedings. See United States v. $148,840.00 in U.S. Currency, 521 F.3d 1268, 1273 (10th Cir. 2008) (contrasting the requirements to establish standing at the motion to dismiss and summary judgment stages of civil forfeiture proceedings). At the summary judgment stage, the district court must ask itself whether "a fair-minded jury" could find that the claimant had standing on the evidence presented. See Anderson, 477 U.S. at 252. "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." Id.

The Fourth Circuit Court of Appeals has employed the dominion and control test to assess the existence of a possessory or ownership interest in a civil forfeiture proceeding. United States v. One Lot or Parcel of Ground Known as 1077 Kittrell Street, Norfolk, Va., No. 90-2759, 1991 WL 227792, at *1 (4th Cir. Nov. 7, 1991) (per curiam) (unpublished table decision); see also United States v. Bryson, 406 F.3d 284, 291 (4th Cir. 2005) (dominion and control test used in criminal forfeiture proceeding); United States v. Morgan, 224 F.3d 339, 343 (4th Cir. 2000) (same). The dominion and control test is widely used by district courts within the Fourth Circuit. See $7,000.00 in U.S. Currency, 583 F. Supp. 2d. at 729 n.4. In order to establish standing under the dominion and control analysis, a claimant cannot rely on "bare legal title" alone. 1077 Kittrell Street, 1991 WL 227792, at *2. Dominion and control can be established through "'possession, title, [and] financial stake.'" United States v. Various Vehicles, Funds, and Real Properties Described in Attachment A, No. 2:11-1528, 2011 WL 6012424, at *3 (D.S.C. Oct. 25,

2011), aff'd, 2011 WL 6019196 (D.S.C. Nov. 30, 2011). "Physical possession of the property alone does not necessarily constitute dominion or control." United States v. $39,557.00, More or Less, in U.S. Currency, 683 F. Supp. 2d 335, 341 (D.N.J. 2010) (citing Munoz-Valencia v. United States, 169 F. App'x 150, 152 (3d Cir. 2006) (unpublished)).

In addition to Article III standing, a claimant must have statutory and prudential standing. Statutory standing is established through compliance "with both the statutory and procedural requirements delineated in 18 U.S.C. § 983(a)(4)(A)" and Rules G(5)(a)(i)(B) and (C) of the Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions. Id. at 338. "Prudential standing encompasses several judicially-created limitations on federal jurisdiction, 'such as the general prohibition on a litigant's raising another person's legal rights . . . and the requirement that a plaintiff's complaint fall within the zone of interests protected by the law invoked.'" CGM, LLC v. BellSouth Telecomm., Inc., 664 F.3d 46, 52 (4th Cir. 2011) (quoting Allen v. Wright, 468 U.S. 737, 751 (1984)). Congress legislates against the background of the Supreme Court's prudential standing doctrine, "which applies unless it is expressly negated." Bennett v. Spear, 520 U.S. 154, 163 (1997). "Unlike Article III standing, issues of prudential standing are non-jurisdictional and may be pretermitted in favor of a straightforward disposition on the merits." United States v. Day, 700 F.3d 713, 721 (4th Cir. 2012) (internal quotation marks omitted). To evaluate prudential standing in this civil forfeiture case, therefore, the court "must identify what interest the litigant seeks to assert and then decide if that interest is arguably within the zone of interests to be protected or regulated by the statute." United States v. $500,000.00 in U.S. Currency, 591 F.3d 402, 404 (5th Cir. 2009) (citing Bonds v. Tandy, 457 F.3d 409, 413-14 (5th Cir. 2006)). Under the applicable civil forfeiture scheme, an "innocent owner" holds the right to defend against the civil forfeiture statute. Id. at 404 (citing 18 U.S.C.

§ 983(d)(1) ("An innocent owner's interest in property shall not be forfeited under any civil forfeiture statute.")).

**B.**

In this case, Hamilton cannot meet his burden to establish Article III standing. First, Hamilton, at the time of the traffic stop, disclaimed any interest in the money. Not only did Hamilton orally advise Trooper Miller and Special Agent Conte that the money was not his and he had no knowledge of it, he disclaimed ownership in writing. By signing the Virginia State Police Asset Disclaimer form, Hamilton stated "that I am not the owner of the listed assets and have no claim for its return to me," and that "I have been advised and understand that by signing this disclaimer of ownership of assets, I am waiving my right to a notice of seizure of the assets and that I do not have a right to file a petition or claim for return of the assets." Asset Disclaimer, Dkt. # 13-4.

The court addressed a similar circumstance in $39,557.00, More or Less, in U.S. Currency. There, a claimant to seized funds was a passenger in a vehicle stopped by police. 683 F. Supp. at 337. During a search of the vehicle, the officer discovered a purse underneath the backseat "containing a large amount of money," and a bag underneath the passenger seat "with a large quantity of United States currency bundled in black rubber bands." Id. The driver, George Gardner, refused to answer any questions, and the passenger, Richard Harold, disclaimed any knowledge of money in the vehicle. Id. at 337-38. The government initiated forfeiture proceedings. Despite his earlier disclaimer, Harold filed a claim to the money. The United States District Court for the District of New Jersey concluded that he lacked Article III standing. Id. at 341. Because the currency was not found on Harold's person, the vehicle where the currency was found did not belong to him, and he disclaimed any interest in or knowledge of the

13

currency during the traffic stop and later at the police station, the court found that the passenger did not have "an apparent or obvious possessory interest" in the seized currency.  Id.  The court reasoned:

> Harold cannot overcome his initial renunciation of the money by his subsequent offers of proof to demonstrate ownership by a preponderance of the evidence.
>
> *   *   *
>
> Harold's responses and behavior are not consistent with ownership of the money.  In addition to making no affirmative claim to the money at the scene, Harold again said nothing about his alleged interest in the money at the police station when Gardner was offered an opportunity to sign the seizure form.  Clearly, Harold's words and actions are inconsistent with ownership.
>
> In addition, Harold's statement that he received the money as inheritance from his deceased grandmother did not come until [two years after the traffic stop], in an unsworn statement made by his attorney.  The failure to identify this interest under oath at the outset is troubling.  Although Harold eventually testified under oath that the money came from his inheritance during the evidentiary hearing, the Court is not persuaded by the evidence. His failure to be forthright, coupled with the inconsistencies and implausibilities in the evidence, all counsel against a finding of standing.

683 F. Supp. 2d at 342.  The same is true in this case.

Likewise, in United States v. $141,480.00 in U.S. Currency, No. 00-1738-CIV (S.D. Fla. Jan. 10, 2001), the court concluded that a claimant to monies could not overcome his initial denial of any knowledge or interest in a large amount of currency found in two boxes claimant was carrying at the time of the seizure.  Although the claimant later filed a verified claim to the monies, he provided no additional evidence and did not appear at the evidentiary hearing on his claim.  Given the claimant's failure to produce some indicia of ownership and possession beyond the verified claim, the court concluded that the claimant failed to demonstrate his standing to contest the forfeiture, concluding as follows:

The Fifth Circuit's admonition is apt in this case: "[A] courier carrying cash from an unknown owner to an unknown recipient, resolute in his determination to give no explanation except that he was asked to transport cash, the ideal mule for drug traffickers, must be prepared to demonstrate that he has a lawful possessory interest."

Id., slip op. at 11 (quoting United States v. $321,470.00, U.S. Currency, 874 F.2d 298, 304 (5th Cir. 1989)); see also United States v. $162,576.00 in U.S. Funds, No. 4:10-CV-100, 2011 WL 5239747, at *5 (M.D. Ga. Nov. 1, 2011) ("Thomas' initial denial of knowledge of the funds after their seizure and until filing her claim demonstrates a lack of control over the funds and is inconsistent with her subsequent claim to the money. . . . This inconsistency prompts the same concern that prevents legal title alone from establishing standing, namely that false claimants will seek funds on behalf of wrongdoers.").

Even if Hamilton could surmount his earlier denial of any knowledge or ownership of the currency and waiver of any claim as to it, he still had no colorable claim to the money at the time it was seized. Considering the evidence in the light most favorable to Hamilton, he cannot establish a colorable ownership or possessory interest in the money.

As to ownership, Hamilton claims that the money was a gift from his great-grandfather, to take effect on his thirtieth birthday. Brooks' statements to Cogdell do not meet the requirements of a valid gift inter vivos. Under the consistent law of Virginia, Maryland and the District of Columbia,[4] a gift made during the life of the donor and not in contemplation of imminent death must evidence the clear intention on the part of the donor to transfer title to the property, delivery to the donee, and acceptance. See Berman v. Lechner, 193 Md. 177, 66 A.2d

---

[4] It is unclear from the facts where Brooks was located were at the time the alleged statements were made to Cogdell. Cogdell stated that Brooks lived for a period of time in Virginia and also in the District of Columbia, her grandmother lived in the District of Columbia and she lived in Maryland. The specific jurisdiction of the alleged gift is immaterial, as all three jurisdictions place the same requirements on a valid gift inter vivos.

392 (1949); <u>Barker v. Barker's Adm'r.</u>, 43 Va. (2 Gratt.) 344, 1845 WL 2878 (1845); <u>Duggan v. Keto</u>, 554 A.2d 1126 (D.C. 1989).

> It is essential to the validity of such a gift that the transfer of both possession and title shall be absolute and shall go into immediate effect.  In other words, the donor must intend not only to deliver possession, but also to relinquish the right of dominion.  If a gift has reference to a future time when it is to operate as a transfer, it is only a promise without consideration, and cannot be enforced either at law or in equity.

193 Md. at 182, 66 A.2d at 393.  <u>See</u> <u>Barker</u>, 1845 WL 2878 at *3 ("There cannot have been a valid gift <u>inter</u> <u>vivos</u>, in this case, because gifts <u>inter</u> <u>vivos</u> have no reference to the future:  if of any effect at all, that effect must be immediate, and absolute."); <u>Duggan</u>, 554 A.2d at 1134 ("The evidence must show that the gift took effect immediately; a gift intended to take effect in the future is not an <u>inter</u> <u>vivos</u> gift.").

A case out of Maryland, <u>Pomerantz v. Pomerantz</u>, 179 Md. 436, 19 A.2d 713 (1941), is instructive.  There, Ruth Pomerantz sued her father Harry for withdrawing from the bank monies she claimed he had gifted to her.  Ruth testified that her father said that monies in a certain bank account set up in the name of "Ruth Pomerantz – Minor, Subject to the order of Harry Pomerantz," were hers when she reached the age of twenty-one years.  This testimony was corroborated by Ruth's mother, Lena, then separated from Harry.  Shortly after she turned twenty-one, Ruth sought to withdraw the money in the bank account but was rebuffed, the bank advising her that the money had been placed in a new account and that she could not withdraw it.  Ruth sued Harry, claiming a completed <u>inter</u> <u>vivos</u> gift.  The Court of Appeals of Maryland was not persuaded that a gift had been completed, reasoning as follows:

> The appellant's own testimony that the gift was to be hers when she was twenty-one years of age is not evidence of a perfected gift at the time the deposits were made.  The fact that the father undid what he had previously done is direct evidence of locus

> poenitentiae.  The appellee had not done everything necessary to
> perfect and complete the gift at the time of appellant's majority
> when appellant claims it became her absolute property.

179 Md. at 441-42, 19 A.2d at 715-16.  Application of that reasoning to this case yields the

inescapable conclusion that no valid gift <u>inter</u> <u>vivos</u> took place.  According to Cogdell, Brooks

told her that the money was to be given to her son when he turned thirty years of age.  Because

the gift to Hamilton was conditioned on a future event – his thirtieth birthday – no effective gift

<u>inter</u> <u>vivos</u> took place under the facts of this case. The same result obtains if the gift is considered

to have been made in 2004 at the time Cogdell's grandmother gave her the black bag.  Consistent

with what she was told by Brooks, Cogdell asserts that her grandmother told her in 2004 that the

money was "for Jonte when he turned 30," Cogdell Dep., Dkt. # 13-5, at 22, a condition she

emphasized in her post-deposition affidavit.  Cogdell Aff., Dkt. # 22, ¶¶ 7-10.  Cogdell averred

that Hamilton had no authority to take the money as he "was not to have possession of it until he

turned thirty."  <u>Id.</u> at ¶8.  As such, the currency did not belong to Hamilton.[5]

Nor did Hamilton have a valid possessory interest in the currency.  Both he and his

mother assert that the money was not his until he turned thirty.  It is undisputed that Hamilton

was only twenty-eight years old on January 13, 2011 when he took it from Cogdell's attic

without her knowledge or permission.  Hamilton Dep., Dkt. # 13-2, at 66, 78-91; Cogdell Dep.,

Dkt. # 13-5, at 22; Cogdell Aff., Dkt. # 22.  Cogdell made this point clear in her affidavit,

stating:

> Jonte Hamilton wrongfully took the currency in this matter from
> my rightful possession and, without any authority whatsoever from

---

[5] Nor can Hamilton argue that the currency is now his as he has turned thirty.  A claimant to forfeited property must demonstrate that he had a "'legal interest' in the property at the time it was forfeited and that this interest 'existed in the property subject to the forfeiture.'"  <u>United States v. Schecter</u>, 251 F.3d 490, 494 (4th Cir. 2001) (quoting <u>United States v. Reckmeyer</u>, 836 F.2d 200, 205 (4th Cir. 1987)).  As Hamilton was only twenty-eight at the time the money was forfeited, he had no claim to it at that time even if the putative conveyance met the test for a valid gift <u>inter</u> <u>vivos</u>.

> me, hid that currency in a van and then, without any authority, purported to disclaim those funds when found by the police. I was not aware that the money had been taken from my possession until after the currency had been seized.

Cogdell Aff., Dkt. # 22, ¶ 9.

The court concludes that Hamilton did not have an ownership or possessory interest in the subject currency necessary to establish Article III standing. Hamilton's actions in this case bear a striking resemblance to the claimant in $39,557.00, More or Less, in U.S. Currency. As with the claimant in that case, Hamilton disclaimed any knowledge of the money after law enforcement discovered it and questioned the vehicle's occupants about the currency. Simply put, Hamilton's "words and actions are inconsistent with ownership." See $39,557.00, More or Less, in U.S. Currency, 683 F. Supp. 2d at 341-42; see also United States v. $1,185,135.00 in U.S. Currency, 320 F. App'x 893, 894-95 (11th Cir. 2008) (per curiam) (affirming district court's ruling that claimant lacked standing where claimant disclaimed ownership of money and signed an asset disclaimer form).

In short, given Hamilton's repeated denial of ownership or knowledge of the monies at the traffic stop, the late breaking inheritance tale is not sufficient to establish standing by a preponderance of the evidence. Moreover, the suspicious circumstances surrounding Hamilton's travel to Texas, including the location and bundling of the cash, the alerting of the drug-sniffing dog, the short window of the rental, and Hamilton's prior involvement with marijuana dealing, all support the government's argument that the money bore a substantial connection to illegal drug trafficking. In short, Hamilton cannot meet his burden of demonstrating that he has Article III standing to challenge the forfeiture of the seized currency.[6]

---

[6] The court's conclusion as to Article III standing is equally conclusive as to the absence of prudential standing in this case. As Hamilton has no ownership or possessory interest in the currency, he does not fall within the zone of interests intended to be protected by the forfeiture statute. See $39,557.00, More or Less, in U.S. Currency, 683

**C.**

Cogdell also fails to meet the requirements of Article III standing in this case.  While in her claim and answer, Cogdell claims to be the owner of the subject currency, Dkt. #s 3, 4, her deposition testimony directly contradicts that assertion.  During her deposition, Cogdell consistently denied any ownership interest in the currency.  Cogdell Dep., Dkt. # 13-5, at 14, 21, 39, 43 and 53.  Indeed, Cogdell repeatedly referred to the defendant currency as belonging to her son.  Id. at 27-28, 31, 39, 43, 52 and 54.  Even in her subsequent affidavit, Cogdell states that "it was his money, not mine."  Cogdell Aff., Dkt. # 22, ¶ 10.  Cogdell's clear, repeated denials of ownership cannot support a claim of ownership interest in the currency.  See $7,000.00 in U.S. Currency, 583 F. Supp. 2d at 731 ("Fatal to El Bey's claims are his admissions that he enjoys neither an ownership nor a possessory interest in the defendant currency. . . .  Based on these admissions, El Bey relinquished any right he may have had to the currency, thereby giving up any right to dominion and control over it.  He therefore lacks standing to seek its return.").

In her deposition, Cogdell admitted that she was not holding the funds in trust for her son, Cogdell Dep., Dkt. # 13-5, at 43, and denied that any documentation exists creating a trust.  Id. at 33, 43.  Although Cogdell appears to claim to be a trustee in her subsequently filed Response in Opposition to the Motion to Strike, Dkt. # 15, and affidavit, Cogdell Aff., Dkt. # 22, her sworn deposition testimony directly contradicts that premise:

> Q:     So you didn't consider [the funds] being held in trust by you for
>         [Hamilton]?
>
> A:     No.

Cogdell Dep., Dkt. # 13-5, at 43.  Indeed, only after the government filed its summary judgment motion in this case, highlighting Cogdell's denial of a trust, does Cogdell raise the notion that

---

F. Supp. at 344.  As Hamilton lacks Article III and prudential standing, the court need not address the question of statutory standing.

she held the funds in trust.  To the extent Cogdell's affidavit contradicts her prior deposition testimony, it must be stricken and will not be considered by the court.  See In re Family Dollar FLSA Litigation, 637 F.3d 508, 513 (4th Cir. 2011) ("[w]hen [a party's] deposition testimony and later affidavit are inconsistent, we will disregard her affidavit and rely on the testimony she gave in her deposition.").

Regardless, even if Cogdell's most recent position is credited, she cannot meet the requirements for creation of a valid trust.  Clear and convincing evidence is required to prove the existence of an oral trust.  Duggan, 554 A.2d at 1133; In re Estate of Tuthill, 754 A.2d 272, 275 (D.C. 2000) ("In cases where a determination must be made as to whether a settlor has created a trust, we demand clear and convincing evidence."); Pope v. Safe Deposit & Trust Co., 163 Md. 239, 161 A. 404, 408 (1932) ("In order to establish a declaration of trust by parol, the trust must be clear and the evidence of it convincing."); Berry v. Berry's Executors & Trustees, 119 Va. 9, 89 S.E. 242, 243 (1916) ("[A]n express trust in either personal property or land can be created by parol . . . [y]et such actions are safeguarded by requiring clear and convincing evidence to establish them.").[7]  Viewing the evidence in the light most favorable to the non-movants, the claimants have failed to produce evidence sufficient for a fair-minded jury to find that they have met that burden.

In order to prove the existence of a valid and binding trust, several elements must be shown by clear and convincing evidence, including the designation of a trustee and beneficiary, the identification of the trust property, and the settlor's manifested intention to create a trust.  Cabaniss v. Cabaniss, 464 A.2d 87, 91-92 (D.C. 1983).  See Killen v. Houser, 239 Md. 79, 84,

---

[7] As noted previously, it is uncertain from the record evidence in this case just which jurisdiction Brooks was located when he mentioned to Cogdell that he would leave her first born son a gift.  Again, Cogdell is a resident of Maryland, Brooks lived in both Virginia and the District of Columbia, and Cogdell's grandmother lived in the District of Columbia.  The law of each jurisdiction is consistent in requiring proof of an oral trust by clear and convincing evidence.

210 A.2d 527, 530 (1965) ("To constitute an express private trust, there must be a fiduciary relationship with respect to property, subjecting the person by whom title to the property is held to equitable duties to deal with the property for the benefit of another person or persons."); Rippon v. Mercantile Safe Deposit & Trust Co. of Baltimore, 213 Md. 215, 229, 131 A.2d 695, 702 (1957) ("The basic tests are whether there is an intention to create a present trust, whether the trust instrument effects a present transfer of the legal title to the trust funds with an equitable estate or estates in a beneficiary or beneficiaries, and whether the transferee is a trustee and not merely an agent of the settlor."); Broaddus v. Gresham, 181 Va. 725, 731, 26 S.E.2d 33, 35 (1943) ("Any words 'which unequivocally show an intention that the legal estate was vested in one person, to be held in some manner or for some purpose on behalf of another, if certain as to all other requisites, are sufficient' to create a trust." (quoting Hammond v. Ridley's Ex'rs., 116 Va. 393, 398, 82 S.E. 102, 103 (1914)).

The evidence in this case does not meet the clear and convincing standard. The claimants have failed to describe in their testimony or pleadings any intention by the parties to create a trustee/beneficiary relationship between Cogdell and Hamilton. Indeed, when the subject was first mentioned to Cogdell, she thought it was a joke. Cogdell Dep., Dkt. # 13-5, at 14. Brooks never told Cogdell that he intended to create a trust for Hamilton, that she was to serve as trustee or identified the trust property. In Woods v. Stull, 182 Va. 888, 30 S.E.2d 675 (1944), the Supreme Court of Virginia held that:

> In order to constitute an express trust there must be either explicit language to that effect or circumstances which show with reasonable certainty that a trust was intended to be created. The declaration must be reasonably certain in its material terms. If the language is so vague, indefinite, or equivocal that any one of the elements is left in uncertainty, the trust must fail.

182 Va. at 902, 30 S.E.2d at 682. Considered in the light most favorable to claimants, Brooks' statements are far too vague, indefinite and equivocal to meet the clear and convincing standard required for creation of an oral trust imposing any equitable duties on Cogdell.

> [S]uch loose, vague, and indefinite expressions as are on this record are insufficient to establish either a gift or a trust. A mere declaration of a purpose to create a gift or trust, a simple promise, without consideration, of a future donation, are alike insufficient. In order to establish a declaration of trust by parol, the trust must be clear and the evidence of it convincing. There must be an intention to transfer a present interest to the cestui que trust, and this requirement is not gratified by evidence which merely shows that the party with title and possession of the res intended it to belong, after his death, to another.

Pope, 161 A. at 408. The same result should obtain in this case.[8]

In short, Cogdell's repeated refrain that the money belongs to her son, and not to her, establishes that she has no financial stake in the subject currency and no Article III standing. In deposition, Cogdell plainly testified that she did not hold the funds in trust. Even if her subsequent affidavit is construed to argue for the creation of an oral trust, it falls short of establishing by clear and convincing evidence that Brooks intended to create an oral trust and that Cogdell was to serve as trustee. Viewed in the light most favorable to her, Cogdell has failed to adduce facts from which a reasonable trier of fact could conclude that she had an ownership interest or possessory interest in the currency. Thus, Cogdell lacks Article III

---

[8] The fact that Cogdell's grandmother gave the bag of money to Cogdell in 2004 does not change the calculus. In deposition, Cogdell testified that her grandmother said the following at the time she handed her the bag: "That this was for Jonte when he turned 30, that I was to give it to him at any time before . . . before then, and she told me to count it." Cogdell Dep., Dkt. # 13-5, at 22. On its face, this statement is plagued with an inherent contradiction – was the bag to be given to Jonte when "he turned 30" or "at any time before then"? Such a vague and equivocal statement cannot meet the clear and convincing evidence standard for creation of an oral trust.

standing because she does not have a legal interest in the property that will be harmed if it is forfeited to the government.[9]

## III.

The court must next consider whether the forfeiture of the subject currency is appropriate. 21 U.S.C. § 881(a)(6) provides for the forfeiture of "[a]ll moneys . . . furnished or intended to be furnished by any person in exchange for a controlled substance . . . all proceeds traceable to such an exchange, and all moneys . . . used or intended to be used to facilitate any violation of this subchapter." The burden of proof lies with the government to show, by a preponderance of the evidence, that the defendant property is subject to forfeiture. 18 U.S.C. § 983(c)(1); United States v. Currency, U.S., $147,900.00, 450 F. App'x 261, 263 (4th Cir. 2011) (unpublished).

In proving that an asset is subject to forfeiture, the government must, by preponderance of the evidence, establish that "a substantial connection exists between the property forfeited and the criminal activity defined by the statute." United States v. $95,945.18, U.S. Currency, 913 F.2d 1106, 1110 (4th Cir. 1990) (citing Boas v. Smith, 786 F.2d 605, 609 (4th Cir. 1986)). The substantial connection test requires "more than an incidental or fortuitous connection to criminal activity," United States v. Schifferli, 895 F.2d 987, 990 (4th Cir. 1990), but does not pose a particularly high hurdle. United States v. Borromeo, 995 F.2d 23, 26 (4th Cir. 1993). "The government may rely on circumstantial evidence to establish forfeitability." United States v. Herder, 594 F.3d 352, 364 (4th Cir. 2010). The determination whether the government has met its burden is based on "the totality of the circumstances." United States v. $864,400.00 in U.S. Currency, No. 1:05cv919, 2009 WL 2171249, at *2 (M.D.N.C. July 20, 2009), aff'd, 405 F. App'x 717 (4th Cir. 2010).

---

[9] As was the case with Hamilton, this conclusion likewise forecloses any claim to prudential standing. Again, no assessment of statutory standing is necessary.

**A.**

Courts rely on a multitude of factors in determining whether the property seized is substantially connected to illegal drug activity. "The use of a rental car, a large quantity of unexplained cash, the presence of weapons, and travel to a source city by an individual with a track record of prior involvement with drugs and firearms" can be relevant factors. United States v. $44,700.00 in U.S. Currency, No. 7:08-3462-HMH, 2010 WL 1257514, at *3 (D.S.C. Mar. 23, 2010). Other factors include:

> the packaging of the currency; the behavior of the individual in possession of the currency, including the individual's explanation for possessing the currency, whether the individual denied possessing the currency, and whether the individual appeared nervous or changed stories; [and] whether a trained narcotics dog alerted to the currency or the location in which the currency was discovered.

United States v. $14,800.00 in U.S. Currency, No. ELH-11-cv-3165, 2012 WL 4521371, at *7 (D. Md. Sept. 28, 2012). The fact that the seized property was hidden, coupled with an individual's "false, conflicting, and implausible statements . . . during his interaction with the officer . . . [and] the presence of marijuana residue . . . [occurring] on a known drug corridor . . . to a known source city . . . in totality," satisfy the substantial connection test. United States v. $50,720.00 in U.S. Currency, 589 F. Supp. 2d 582, 583-84 (E.D.N.C. 2008).

Considered in their totality, the facts of this case demonstrate a substantial connection between the seized currency and illicit drug activity. In this case, David Wright rented a vehicle on January 13, 2011, which was due back in rather quick order, on January 15, 2011. When Trooper Miller pulled the vehicle over, Hamilton told him they were traveling to Houston to perform in a rap concert and music video, but could not provide any more specifics about the concert or the video when questioned by law enforcement. Hamilton admitted it takes about 24

hours to drive from Maryland to Houston. A narcotics canine gave a positive alert near the rear of the vehicle where the currency was hidden. The subject currency was secreted behind a rear panel inside the vehicle, bundled with rubber bands and wrapped in plastic grocery bags. Although no narcotics were found during the stop, Trooper Miller noted the smell of marijuana inside a briefcase in the vehicle. Hamilton did not speak up when Wright denied there were any large sums of money inside the vehicle before the search took place, and he disclaimed any knowledge or ownership of the defendant currency no less than three times during the traffic stop. Hamilton signed and initialed an asset disclaimer form waiving his rights to the currency. Hamilton told the officers that he had served time on marijuana and gun charges.

The circumstances of Hamilton's arrest on drug charges five months before the seizure in this case are not coincidental. Rather, they are strikingly suggestive of drug dealing. In August, 2010, Hamilton, again traveling with Moeconi Crutchfield in a rented vehicle, was subjected to a traffic stop in Lake Charles, Louisiana. Hamilton Dep., Dkt. # 13-2, at 95-104. During the course of that encounter, police discovered marijuana hidden in the trunk of the car. Crutchfield and Hamilton were arrested, and the drug charges were pending at the time of the January 13, 2011, traffic stop in this case. In deposition, Hamilton denied that the marijuana was his and asserted that he was in Louisiana on vacation. David Wright, the third occupant and lessee of the Explorer on January 13, 2011, also was involved in the Louisiana trip, having rented one of the vehicles used on that trip south as well. Hamilton Dep., Dkt. # 13-2, at 101.

Of course, the discovery of large quantities of cash alone is not sufficient to show a connection to illegal drug transactions, but it can be "strong evidence that the money was furnished or intended to be furnished in return for drugs." United States v. $93,685.61 in U.S. Currency, 730 F.2d 571, 572 (9th Cir. 1984). Additionally, traveling with large sums of cash

banded by rubber bands and wrapped in several layers of plastic is not consistent with legitimate business activity.  See United States v. $124,700 in U. S. Currency, 458 F.3d 822, 826 (8th Cir. 2006) ("[W]e have adopted the commonsense view that bundling and concealment of large amounts of currency, combined with other suspicious circumstances, supports a connection between money and drug trafficking."); United States v. $242,484.00, 389 F.3d 1149, 1160-61 (11th Cir. 2004) ("A common sense reality of everyday life is that legitimate businesses do not transport large quantities of cash rubber-banded into bundles and stuffed into packages . . . because there are better, safer means of transporting cash if one is not trying to hide it from the authorities.").  Hamilton's initial denial of knowledge of the money and disclaimer of ownership, though later recanted, also support that Hamilton was not in possession of the money for legitimate purposes.

In addition, the narcotics canine alerted to the presence of the odor of controlled substances near the rear of the Explorer.  See United States v. $2,599.00 in U.S. Currency, et al., No. 7:11cv192, 2013 WL 1786493 (E.D.N.C. Apr. 25, 2013) (addressing alert by narcotics canine to suitcase in trunk of car containing $691,814.00 as confirming connection to illegal drugs); United States v. Funds in Amount of $30,670.00, 403 F.3d 448, 459 (7th Cir. 2005) ("[I]t is likely that trained cocaine detection dogs will alert to currency only if it has been exposed to large amounts of illicit cocaine within the very recent past."); $50,720.00 in U.S. Currency, 589 F. Supp. 2d at 583-84 (granting summary judgment in favor of the government in a civil forfeiture case in which a large amount of currency was found in a suitcase in the trunk of a car and a drug dog alerted to the suitcase and the trunk).

Further, Hamilton's previous drug conviction and recent arrest on drug charges are probative evidence that the money in this case was related to illegal drug activity.  See United

States v. $22,474.00 in U.S. Currency, 246 F.3d 1212, 1217 (9th Cir. 2001) ("Evidence of a prior drug conviction is probative of probable cause"); United States v. U.S. Currency $83,310.78, 851 F.2d 1231, 1236 (9th Cir. 1988) (claimant's prior arrests and convictions on drug charges "are circumstances demonstrating more than mere suspicion of his connection with an illegal drug transaction.").  The connection is especially clear here as, just five months before the traffic stop in this case, Hamilton was arrested on drug charges far from home in Lake Charles, Louisiana in a car driven by Crutchfield and rented by David Wright.  Hamilton's prior drug conviction and arrest provide a nexus to illegal drugs that is consistent with other indicators of drug-related purposes for the bundled currency seized from the Explorer.[10]

Considered in totality, the government has met its burden of showing by preponderance of the evidence that there is a substantial connection between the seized currency and illicit drug activity.  The large quantity of cash was packaged in a manner suggestive of illegal drug activity, and it was hidden behind a panel in the rear of the vehicle.  Hamilton initially denied any ownership or knowledge of the currency during the traffic stop.  The currency was discovered in a rental car en route to the southwestern United States, a source point for illegal drugs.  The drug-sniffing dog alerted on the rear passenger side of the vehicle, and Trooper Miller noted the smell of marijuana when he opened a briefcase during the search.  Hamilton told Special Agent Conte that he smoked marijuana occasionally and recently served time for possession of marijuana and a handgun.  Not only does Hamilton have a prior marijuana distribution conviction, he was charged in a drug-related offense a few months before the traffic stop at issue and involving the same persons as the January 13, 2011 stop.  Hamilton could provide few specifics to substantiate his rationale for traveling half-way across the country with a short

---

[10] It is an unfortunate fact of modern life that drug dealing and gun violence go hand in hand.  In that regard, the court notes that Moeconi Crutchfield, Hamilton's companion on both the 2010 and 2011 trips, was murdered in 2011, Hamilton Dep., Dkt. # 13-2, at 103, and Hamilton himself was shot late that same year.  Id. at 7.

turnaround time, nor did he provide any plausible explanation for the need to have such a large amount of cash on hand at the concert and video production. These indicators, when considered in totality, convince the court that there is a substantial connection between the $119,030.00 seized during the traffic stop and illicit drug activity. Plainly, the government has carried its burden in this case. See United States v. $21,175.00 in U.S. Funds, No. 4-11-CV-38, 2012 WL 2529427 (M.D. Ga. June 29, 2012); United States v. $79,010.00 in U.S. Currency, No. CV-10-0244, 2012 WL 1150849 (D. Ariz. April 5, 2012).

Hamilton has not "come forward with specific facts showing that there is a genuine issue for trial." United States v. $95,945.18 in U.S. Currency, 913 F.2d 1106, 1111 (4th Cir. 1990). Hamilton offers that he, Crutchfield and Wright were traveling to Houston to participate in a concert and film a rap video. Hamilton provided virtually no details concerning his plans to the officers, and his efforts at deposition to explain the need for such a large sum of cash were simply unavailing. Not only does Hamilton utterly fail to provide any plausible explanation for the need to take such a large sum of money to Houston, he provides no explanation for why he hid it in the rear door panel of the Explorer and why he did not tell his traveling companions about the money. His description of the planned trip to Houston yielded only sketchy details at odds with career plans involving such a large sum of money.

Hamilton's tale as to the source of the funds is similarly implausible. Although Cogdell had seven or eight siblings and Hamilton twenty to thirty cousins, Hamilton Dep., Dkt. # 13-2, at 81-82, Hamilton claims that Brooks left him alone this large sum of cash more than twenty years ago. This claimed source of funds is simply incredible given the fact that when Brooks died, he left nothing to either Cogdell or Hamilton. Additionally, while Hamilton claims to have had a "long talk with almost every . . . member of [his] family about [the money]," id. at 71, Cogdell

testified that no one knew about it.  Cogdell Dep., Dkt. # 13-5, at 43-44.  Cogdell's late breaking assertion that she was to keep the money in trust for Hamilton is hardly consistent with placing it in a bag in the attic and never looking at it again.  Given Hamilton's denial at the scene of the traffic stop and his waiver of any interest in the money, his later claim to a gift, under improbable circumstances, does not create a jury issue.  Taken in the light most favorable to Hamilton, the facts of this case compel the court to conclude that a reasonable jury could not find it more likely than not that Hamilton possessed the currency in this case for legitimate, nondrug related reasons.

The government clearly has carried its burden of showing by a preponderance of the evidence that there is a substantial connection between the money seized from Hamilton and a drug trafficking offense.  18 U.S.C. § 983(c)(3).  As already noted, to defeat summary judgment, Hamilton must present evidence sufficient for a reasonable jury to return a verdict in his favor.  Anderson, 477 U.S. at 248.  Hamilton has failed to do so, and the government therefore is entitled to summary judgment.

## IV.

For these reasons, the government's motion for summary judgment, Dkt. # 13, is **GRANTED**, and the $119,030.00 is forfeited to the United States.  Lacking an ownership or possessory interest in the subject currency, Hamilton and Cogdell lack standing.  As such, Cogdell's motion for summary judgment, Dkt. # 24, is **DENIED**.  Lacking both standing and a

legitimate expectation of privacy in the rental vehicle, Hamilton's motion to suppress, Dkt. #23,

is **DENIED**.   An appropriate Order will be entered.

Entered:  July 2, 2013

*/s/ Michael F. Urbanski*

Michael F. Urbanski
United States District Judge